**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A ARREST WARRANT**

I, Special Agent Benjamin Slocum, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18 of the United States Code. I also am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

2. I am a Special Agent with the U.S. Department of Homeland Security, Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been so employed since June 2007. I am currently assigned to the Manchester, New Hampshire field office. As part of my regular duties as a Special Agent, I investigate criminal violations relating to a broad range of immigration and customs-related statutes and have been cross-designated to investigate violations relating to the distribution of illicit narcotics as specified under Title 21 of the U.S. Code. I have been trained in drug investigations, search warrants, undercover techniques, surveillance, debriefing of informants, and other investigative procedures. Through my training, education, and experience, I have become familiar generally with the manner in which drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. In the course of participating in investigations of drug distribution organizations, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of search warrants, the use of tracking devices,

debriefings of subjects, witnesses, and informants, and reviews of consensually recorded conversations and meetings.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## STATUTORY AUTHORITY

4. Title 21, United States Code, Section 846 provides, in pertinent part:

Any person who conspires to commit any offense defined in [Chapter 13, Subchapter I of the Drug Abuse Prevention and Control Act] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the conspiracy.

21 U.S.C. § 846. Title 21, United States Code, Section 841 provides, in pertinent part:

It shall be unlawful for any person knowingly or intentionally to distribute a controlled substance.

21 U.S.C. § 841.

## PROBABLE CAUSE

4. Based on my training and experience, and the facts set forth in this affidavit, I have probable cause to believe Lamar CARTER ("BANDO or BOOG"), Isaiah WADE ("SAV or SAVAGE"), Manuel HENDERSON (FRESH or RED), Aundre LESTER ("KAI, BANGA or KODAK"), Xavier SMITH ("NUKE"), and Korron BENTHALL ("READY or READY BOY"), and Danna FRAZIER have engaged in a conspiracy to distribute Schedule II controlled substances and have unlawfully distributed controlled substances, namely crack cocaine, in violation of Title 21, United States Code, Sections 846 and 841.

2

5.     Over the last year or so, the Keene Police Department (KPD) has seen a significant surge with drug trafficking from out of state residents, specifically New York and New Jersey. Over the past several months, a number of confidential informants (CI) and sources of information (SOI) have provided information to the KPD regarding such activity.  During this investigation, law enforcement has identified Lamar CARTER and Isaiah WADE as leaders of a crack cocaine distribution organization operating in the Keene, New Hampshire area.

6.     To date, law enforcement has been able to identify at least five subjects working for CARTER and WADE to include: HENDERSON, BENTHALL, LESTER, SMITH, and FRAZIER.  Several of the subjects identified to include CARTER and WADE are verified gang members of the Bloods Street Gang and have ties to New Jersey.  WADE is currently on federal probation for distribution of a controlled substance.

7.     Of particular interest, the KPD received information that several subjects of the organization are traveling to New Jersey on a weekly basis to resupply with kilo level amounts of cocaine.  They then transport the cocaine back to Keene, New Hampshire from New Jersey.  Once in Keene, members of the organization are manufacturing the cocaine into crack cocaine.

8.     Since April 2022, several New Jersey registered vehicles and rental vehicles have been seen at known "drug houses" or people known to be from the state of New Jersey coming and going from the Keene, New Hampshire area.

9.     During this investigation, members of law enforcement have seen known members of the organization to include CARTER and WADE, driving around Keene in rental vehicles. These vehicles are normally rented for the organization using a straw renter. All the straw renters are known narcotic users.

10.    In May 2022, law enforcement obtained the assistance of two cooperating individual (hereafter, "Cooperating Individual or "CI-1" and "CI-2"), who could conduct a

3

controlled purchases of crack cocaine directly from CARTER, WADE or "Runners" and supplied information related to how the organization operates. KPD received information from the cooperating individuals that the organization was operating out of

NH. CI-1 agreed to cooperate with law enforcement in exchange for consideration for leniency on pending criminal charges related to the distribution of crack cocaine. CI-1's criminal history includes convictions for the following (all of which are New Hampshire state offenses): Driving while Intoxicated, Acts Prohibited, Shoplifting, Simple Assault, Simple Assault (DV), Willful Concealment, and Breach of Bail. CI-2 agreed to cooperate with law enforcement in exchange for consideration for leniency on pending criminal charges related to the distribution of crack cocaine. CI-2 did receive financial compensation for information provided. CI-2's criminal history includes convictions for the following (all of which are New Hampshire state offenses): Theft-Willful Concealment and Acts Prohibited.

11.    On May 2, 2022, KPD observed two black males exiting NJ registration U20MJW in front of _____ Keene, NH and entering the residence. It was later determined that NJ U20MJW is owned by Enterprise Rental. The vehicle was rented by Carri Carr. Carr is also known to KPD as a narcotic user. _____ was being rented by a Danna FRAZIER. FRAZIER is known to the KPD as a narcotic user.

12.    <u>Controlled purchase 1:</u> On May 5, 2022, law enforcement officers met with CI-1 to prepare for a controlled purchase of a "ball" of crack cocaine from "Bando" who I know to be CARTER from reviewing a reliable law enforcement database. When law enforcement met with CI-1, CI-1 was searched for weapons, money, and drugs without findings. CI-1 was given $250.00 in US currency, a one-way transmitter, and an audio recorder.

13.    At law enforcement's request, CI-1 was directed to call CARTER. CI-1 called the number we have associated with CARTER. CARTER answered the phone and stated "Sav" would

4

be meeting CI-1 in approximately ten minutes because CARTER was not available. "Sav" is known to law enforcement to be WADE. The meet was set to take place at a location near downtown Keene, NH.

14. A short time later, law enforcement observed a small, dark-colored sedan pull up in front of the meet location. The driver and passenger exited the vehicle (white male driver and black male passenger). The passenger walked up to CI-1 and exchanged cash for suspected crack cocaine. Both occupants from the sedan returned to the vehicle. The sedan left the area and was surveilled back to                    and parked in the vicinity of

15. Following the controlled purchase, law enforcement met with CI-1 at a predetermined location. CI-1 turned over the purported crack cocaine to law enforcement. CI-1 knew the person that showed up for the controlled purchase to be "Sav". CI-1 handed "Sav" $250.00 in exchange for the "ball" of crack cocaine. When law enforcement met with CI-1, CI-1 was again searched for weapons, money, and drugs without findings.

16. Later the suspected crack cocaine was sent to the Customs and Border Protection Laboratories for a chemical analysis. The substance tested positive for cocaine base and a net weight of 3.05 grams.

17. Controlled purchase 2: On May 10, 2022, law enforcement officers met with CI-1 to prepare for a controlled purchase of a "ball" of crack cocaine from "Bando" who I know to be CARTER from a review of a reliable law enforcement database. When law enforcement met with CI-1, CI-1 was search for weapons, money, and drugs without findings. CI-1 was given $250.00 in US currency, a one-way transmitter, and an audio recorder.

18. At law enforcements request, CI-1 contacted CARTER on his cell phone to purchase a "ball of crack" for $250.00. CARTER answered the phone and stated someone would be meeting CI-1 downtown in approximately ten minutes because he was not available.

5

19.     Prior to CI-1 placing the call, law enforcement was surveilling and noted the New Jersey rental car (NJ U20MJW) was parked outside FRAZIER's apartment. Minutes after CI-1 placed the phone call to CARTER, two people exited                and got into the New Jersey rental. The vehicle traveled directly to the meet location.

20.     CI-1 met with the passenger of the New Jersey rental vehicle and exchanged cash for suspected crack cocaine. The NJ rental left the area and was surveilled back to                Lane and parked in the vicinity of       Following the controlled purchase, law enforcement met with CI-1 at a predetermined location. CI-1 turned over the purported crack cocaine.

21.     CI-1 didn't know the target's name but knew their cash app name and their phone number. CI-1 provided law enforcement with both. The cash app name was (Nukeee "NuketheG1"). CI-1 stated the person's face depicted in the Cash App photo was the person with whom the exchange took place.

22.     Based on an identification from the Jersey City Police Department in NJ, "Nuke" was identified as Xavier SMITH. When law enforcement met with CI-1, CI-1 was again searched for weapons, money, and drugs without findings.

23.     Later the suspected crack cocaine was sent to the Customs and Border Protection Laboratories for a chemical analysis. The substance tested positive for cocaine base and a net weight of 2.60 grams.

24.     <u>Controlled purchase 3</u>: On May 17, 2022, law enforcement officers met with CI-2 to prepare for a controlled purchase of a "ball and a half" of crack cocaine from "Sav" who I know to be WADE. When law enforcement met with CI-2, CI-2 was searched for weapons, money, and drugs without findings. CI-2 was given $400.00 in US currency, a one-way transmitter, and an audio recorder.

25. At the request of law enforcement, CI-2 contacted WADE on his cell phone to purchase a "ball and a half of up" for $400.00. I know "up" to be a term commonly used when referring to crack cocaine. CI-2 stated WADE answered the phone and stated he would be around if CI-2 wanted to swing by              An Undercover Homeland Security Agent (UCA) accompanied CI-2 to the parking lot o

26. CI-2 and the UCA entered the parking lot at              CI-2 entered the residence of              while the UCA remained outside. Inside the residence, CI-2 met with WADE and exchanged $400 for suspected crack cocaine. After the controlled purchase, CI-2 returned to the UCA in the parking lot and relinquished the purported crack cocaine.

27. Later the suspected crack cocaine was sent to the Customs and Border Protection Laboratories for a chemical analysis. The substance tested positive for cocaine base and a net weight of 4.36 grams.

28. <u>Controlled purchase 4</u>: On May 24, 2022, law enforcement officers met with CI-2 to prepare for a controlled purchase of "one ball" of crack cocaine from "Bando" who I know to CARTER. When law enforcement met with CI-2, CI-2 was searched for weapons, money, and drugs without findings. A UCA accompanied CI-2 to

29. While inside the residence, CI-2 met with CARTER on the stairs while the UCA remained downstairs. The UCA was able to identify CARTER as the person that CI-2 met with. Also, inside the residence at the time of the controlled purchase was Manuel HENDERSON (no contact). The UCA was able to identify HENDERSON.

30. On this day, law enforcement observed CI-2 and the UCA enter              While maintaining surveillance of the apartment complex, Aundre LESTER was seen walking toward the apartment. Following the controlled purchase, law enforcement met with CI-2. CI-2 turned over the purported crack cocaine. CI-2 knew the person present for the controlled

7

purchase to be "Bando", who is known to law enforcement as CARTER. CI-2 handed CARTER $250.00 in exchange for the "one ball" of crack cocaine.

31. Later the suspected crack cocaine was sent to the Customs and Border Protection Laboratories for a chemical analysis. The substance tested positive for cocaine base and a net weight of 3.01 grams.

32. <u>Controlled purchase 5:</u> On May 25, 2022, law enforcement officers met with CI-2 to prepare for a controlled purchase of "two balls" of crack cocaine from "Sav" who I know to be WADE. When law enforcement met with CI-2, CI-2 was searched for weapons, money, and drugs without findings. At the direction of law enforcement, CI-2 placed a phone call to WADE, requesting to purchase "two balls". WADE answered the phone and informed CI-2 he would be sending "Fresh" who is known by law enforcement as Manuel HENDERSON.

33. Observations made by law enforcement had HENDERSON and CI-2 leaving the residence of                       to meet with the UCA at a location in downtown Keene. CI-2 and HENDERSON met with the UCA. The UCA handed Henderson the $500.00 in exchange for the "two balls". The UCA recognized the person at the controlled purchase as HENDERSON.

34. Later the suspected crack cocaine was sent to the Customs and Border Protection Laboratories for a chemical analysis. The substance tested positive for cocaine base and a net weight of 6.16 grams.

35. On May 29, 2022, a patrol officer from KPD attempted to conduct a vehicle stop on a vehicle with two occupants. Prior to the vehicle stop, the patrol officer observed HENDERSON in the front passenger seat. The patrol officer had knowledge that HENDERSON had an active state arrest warrant for violation of New Hampshire law.

36. As the patrol officer attempted to stop the vehicle, the vehicle fled. After a short pursuit, the vehicle crashed, and HENDERSON fled on foot. The patrol officer observed

8

HENDERSON holding a dark colored bag upon exiting the vehicle. HENDERSON threw the dark colored bag to the ground and fled on foot. Ultimately, the dark colored bag was located on the ground near where HENDERSON exited the vehicle and within the bag was a substance believed to be crack cocaine.

37. Later the suspected crack cocaine was sent to the Customs and Border Protection Laboratories for a chemical analysis. The substance tested positive for cocaine base and a net weight of 14.06 grams.

38. <u>Controlled purchase 6:</u> On June 1, 2022, law enforcement officers met with CI-2 to prepare for a controlled purchase of "two balls" for $500.00 from CARTER. On this day, CI-2 had arranged to pick up CARTER at                           and drive to the location of the UCA for the controlled purchase.

39. CI-2 arrived at the meet location with CARTER in the front passenger seat and LESTER in the back seat. The UCA entered the vehicle containing CARTER and LESTER. The UCA handed LESTER the $500.00 in exchange for the two balls of crack cocaine. LESTER removed the crack cocaine from a black backpack he was holding. The UCA recognized the person at the controlled purchase as CARTER and LESTER.

40. Later the suspected crack cocaine was sent to the Customs and Border Protection Laboratories for a chemical analysis. The substance tested positive for cocaine base and a net weight of 6.19 grams.

<u>Residence search</u>

41. On June 6, 2022, at 1100 hours, members of the Cheshire County Sheriff's Office and members of the Keene Housing Authority served the Writ of Possession at        When law enforcement knocked on the front door, two black males were seen running out of the back door of the residence.

42. Deputies announced their presence and the reason they were entering the apartment. Once Deputies entered the residence, they noticed a strong order of marijuana inside. After several minutes of calling out and announcing their presence, FRAZIER appeared from one of the upstairs bedrooms and came down.

43. Once FRAZIER was outside, Deputies conducted a search of the residence to make sure no one else was present. While conducing this search, Deputies noticed in the living room a desk. On this desk, they observed in plain view a large quantity of U.S. Currency bound with rubber bands. Also on the desk was a large plastic bag. Within the plastic bag were several smaller plastic baggies that contained what Deputies believed to be crack cocaine.

44. At this time, Deputies secured the residence and applied for a state search warrant. Deputy Peter Bowers applied for and was granted a search warrant for                by the Honorable Judge Tina Nadeau of the 8th Circuit Court of Keene.

45. During the search of the residence Deputies located approximately 9 ounces of suspected crack cocaine, US Currency, Smith & Weston 9mm pistol, New Jersey ID for a Xavier SMITH and CARTER, baggies, and scales.

46. Later the suspected crack cocaine was sent to the Customs and Border Protection Laboratories for a chemical analysis. The substance tested positive for cocaine base and a net weight of 107.92 grams.

47. <u>Controlled purchase 7:</u> On June 16, 2022, the UCA contacted CARTER and arranged to purchase "two balls" for $500.00 of crack cocaine. CARTER instructed the UCA to a meet in a parking lot within the City of Keene. Prior to the meeting, law enforcement observed UT V975YM parked in front of a residence on Marlborough Street in Keene.

48. A short time late, law enforcement observed CARTER exit the residence and get into the vehicle. CARTER then drove the vehicle to the agreed upon meet location.

49. At the meet location, the UCA entered the vehicle and CARTER drove away. At that time, CARTER handed the UCA the agreed upon amount of crack cocaine and the UCA handed CARTER the $500. CARTER stopped the vehicle and the UCA exited.

50. Law enforcement continued to observe the vehicle. A short time later, CARTER was seen stopping next to two known drug users in Keene. The two subjects entered the vehicle and they drove a short distance and the subject exited the vehicle.

51. Later the suspected crack cocaine was sent to the Customs and Border Protection Laboratories for a chemical analysis. The substance tested positive for cocaine base and a net weight of 6.25 grams.

52. <u>Controlled purchase 8:</u>  On June 23, 2022, law enforcement officers met to prepare for a controlled purchase of "four balls" for 825.00. The UCA contacted CARTER directly to arrange the controlled purchase. CARTER directed the UCA to the Savings Bank of Walpole parking lot on Marlboro Street.

53. While the UCA was on the phone with CARTER, CARTER informed the UCA someone would be meeting them shortly. Law enforcement observed BENTHALL enter the parking lot of the bank and meet with the UCA. The UCA handed BENTHALL the $825.00 in exchange for the "four balls".

54. The UCA and BENTHALL had a conversation about a scar on BENTHALL's arm. BENTHALL informed the UCA he sustained the scar because he was shot by the police doing something he was not supposed to be doing. A law enforcement officer in Jersey City, NJ confirmed BENTHALL was shot by the police in his arm.

55. Later the suspected crack cocaine was sent to the Customs and Border Protection Laboratories for a chemical analysis. The substance results are still pending. The estimated weight of the suspected crack cocaine is 16.20 grams.

56.     Controlled purchase 9: On July 12, 2022, law enforcement officers met to prepare for a controlled purchase. The prior evening the UCA contacted CARTER to purchase a one ounce of crack cocaine. The UCA and CARTER negotiated a price of $1,400. Prior to the meeting, the UCA contacted CARTER on his cell phone, and CARTER directed the UCA to Key Road in Keene, NH.

57.     While in the vehicle with CARTER, CARTER stated that he only was in possession of a "half". The UCA knew this to mean a half ounce. The UCA and CARTER discussed what the price was for the "half". CARTER stated that he would take $700. The UCA then handed Carter the $700 in exchange for the "half" ounce of crack cocaine.

58.     Later the suspected crack cocaine was sent to the Customs and Border Protection Laboratories for a chemical analysis. The substance results are still pending. The estimated weight of the suspected crack cocaine is 15.20 grams.

## CONCLUSION

59.     Based on the information set forth above, I submit that there is probable cause to believe that on the dates referenced herein the District of New Hampshire, Lamar CARTER, Isaiah WADE, Manuel HENDERSON, Aundre LESTER, Xavier SMITH, Korron BENTHALL and Danna FRAZIER distributed controlled substances and participated in a conspiracy to distribute controlled substances in violation of Title 21, United States Code, Section 846 and 841.

/s/ Benjamin Slocum
Special Agent Benjamin Slocum
Homeland Security Investigations

SUBSCRIBED AND SWORN TO BEFORE ME this the  11th  day of  August , 20 22 .

/s/ Andrea K. Johnstone
Hon. Andrea K. Johnstone
United States Magistrate Judge

13